UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| LORA R, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §  Case # 1:21-cv-344-DB |
| | § |
| COMMISSIONER OF SOCIAL SECURITY, | §  MEMORANDUM DECISION |
| | §  AND ORDER |
| Defendant. | § |

## INTRODUCTION

Plaintiff Lora R. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 8, 9. Plaintiff also filed a reply. *See* ECF No. 10. For the reasons set forth below, Plaintiff's motion (ECF No. 8) is **GRANTED IN PART**, the Commissioner's motion (ECF No. 9) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings.

## BACKGROUND

On August 10, 2015, Plaintiff protectively filed an application for disability insurance benefits ("DIB") under Title II of the Act, and an application for SSI under Title XVI of the Act,

alleging disability beginning December 31, 2001(the disability onset date),[1] due to a variety of physical and mental impairments. Transcript ("Tr.") 433-41. After Plaintiff's claims were denied (Tr. 250-69), she requested an administrative hearing (Tr. 283). On July 19, 2018, Plaintiff's request for a hearing was dismissed due to her failure to respond and appear. Tr. 276-77. Subsequently, on July 24, 2019, the Appeals Council determined that the July 19, 2018 dismissal was not proper and remanded the matter to an administrative law judge to offer Plaintiff the opportunity for a new hearing. Tr. 278-81.

Thereafter, on January 29, 2020, Administrative Law Judge Paul Georger ("the ALJ") held a hearing in Buffalo, New York, at which Plaintiff appeared and testified and was represented by Kelly Laga, an attorney. 137, 157-209. Esperanza Distefano, an impartial vocational expert, also appeared and testified at the hearing. *Id*. On April 1, 2020, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. Tr. 134-56. On January 22, 2021, the Appeals Council denied Plaintiff's request for further review. Tr. 1-6. The ALJ's April 1, 2020 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more

---

[1] Plaintiff later amended her alleged disability onset date to July 8, 2015, and therefore, did not have disability insured status on the date of onset. Tr. 137. *See* 20 CFR 404.130, 404.131, and 404.315. At the hearing, Plaintiff, through her representative, voluntarily elected to withdraw her request for hearing as it pertains to her DIB application. Tr. 137. Accordingly, Plaintiff's DIB claim was dismissed. Tr. 137-38, 151.

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his April 1, 2020 decision:

1. The claimant has not engaged in substantial gainful activity since July 8, 2015, the amended alleged onset date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: cluster and migraine headaches with myofascial pain syndrome, major depressive disorder, bipolar disorder, anxiety disorder, and post-traumatic stress disorder ("PTSD") (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b)[2] except the claimant can occasionally climb ramps and stairs, occasionally climb ladders, ropes or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch and crawl. The claimant can perform simple, routine and repetitive tasks. The

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

claimant can make simple, work-related decisions. The claimant can have occasional interaction with coworkers, supervisors and the public.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on April 17, 1966 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR and 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2001, through the date of this decision (20 CFR 416.920(g)).

Tr. 134-50.

Accordingly, the ALJ determined that, based on the application for supplemental security income protectively filed on July 8, 2015, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act. Tr. 151.

## **<u>ANALYSIS</u>**

Plaintiff asserts two points of error. Plaintiff first argues that the ALJ failed to incorporate limitations assessed by consulting psychiatric examiner Janine Ippolito, Psy.D. ("Dr. Ippolito"), whose opinion the ALJ assigned great weight, and failed to provide an explanation for not incorporating some of the limitations identified in Dr. Ippolito's opinion into the RFC. *See* ECF No. 8-1 at 1, 8-12. Plaintiff makes a similar argument regarding the ALJ's consideration of the opinion of consulting internal medicine examiner Russell Amundson, M.D. ("Dr. Amundson"),

whose opinion the ALJ assigned significant weight. *See id*. at 1, 12-14. Plaintiff argues that the ALJ failed to incorporate Dr. Amundson's assessed sitting, standing, and walking limitations, as well as his limitations regarding migraines, and did not explain his reasons for not incorporating these limitations.  *Id*.

In response, the Commissioner argues that, despite assigning Dr. Ippolito's opinion great weight, the ALJ was not required to incorporate every aspect of her opinion into his RFC finding. *See* ECF No. 9-1 at 8-9. Further, argues the Commissioner, Dr. Ippolito's opined moderate limitations are not inconsistent with the ALJ's RFC finding for a range of simple work, and the opinion does not support an RFC finding that is more restricted than the ALJ found. *See id*. at 9. Regarding Plaintiff's second point of error, the Commissioner responds that the ALJ reasonably considered Dr. Amundson's opinion and properly found his opinion that Plaintiff could stand and walk for one hour continuously and for a total of four hours in an 8-hour workday was consistent with an RFC for light work. *See id*. at 10-13.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ's mental RFC finding was supported by substantial evidence, including Dr. Ippolito's opined moderate limitations, the moderate level limitations opined by state agency psychological consultant Timothy Ostrich Psy.D. ("Dr. Ostrich"), treatment records showing grossly normal mental status findings,

Plaintiff's improvement with treatment despite evidence of non-compliance, and Plaintiff's ability to perform a wide range of independent activities of daily living. Furthermore, contrary to Plaintiff's argument, the ALJ was not required to wholesale adopt Dr. Ippolito's opinion because he gave it great weight.

However, the Court finds merit to Plaintiff's argument that the ALJ's physical RFC finding for light work is inconsistent with Dr. Amundson's opinion that Plaintiff could sit, stand, and walk for one hour continuously and for a total of 4 hours in an 8-hour workday. According to SSR 83-10, light work requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10 (S.S.A. 1983). While the ALJ's RFC for light work imposes certain postural limitations (climbing, balancing, stooping, crawling, etc.), there is no mention of a sit/walk/stand limitation in accordance with Dr. Amundson's opinion and, despite giving the opinion great weight, the ALJ failed to discuss the contents of Dr. Amundson's opinion in any meaningful detail. As the ALJ failed to provide any explanation for not including sit/walk/stand limitations, the Court is unclear how the ALJ determined that Plaintiff was capable of performing light work without any such limitations. *See Starr v. Saul*, No. 18-CV-241, 2019 WL 3997318, at *3 (W.D.N.Y. Aug. 23, 2019) (remand where the ALJ failed to explain or connect "any treatment records to the RFC"). Accordingly, remand is warranted solely on this point.

Plaintiff alleges an inability to work due to physical and mental impairments. She reported that she experienced symptoms of chronic pain, fatigue, limitations of mobility, sleep disruption, weakness, and dizziness due to migraines. Tr. 531-41. Plaintiff also reported that due to her mental impairments, she experienced symptoms of variable moods, irritability, crying spells, panic attacks, nightmares/flashbacks, self-esteem issues, loss of interest in activities once enjoyed,

decreased energy, social isolation, confusion, insomnia, distractibility, and concentration and memory deficits. *See id*.

On June 20, 2015, Plaintiff presented to the Emergency Department ("ED") at Penn Medicine, complaining of eye pain and stating that she wanted to "fly to Switzerland where suicide is legal." Tr. 603. She reported a history of depression and anxiety. Tr. 604. She also reported worsening depression and suicidal ideation over the past several years. *Id*. She believed her worsening depression was exacerbated by recent visual problems and "may be connected with her emotions." *Id*. Plaintiff described "waking up with facial muscle contractions that she ha[d] to spend hours massaging to gain relief, [and which were] easily re-provoked during the day." Tr. 604-05. She also described poor mood and negative thinking, including feeling isolated, lonely, hopeless, with low self-esteem, anhedonia, regret and feelings of guilt, poor appetite, and increasing suicidal ideation. Tr. 605.

On mental status examination, Plaintiff appeared unkempt and disheveled with depressed, sad, and hopeless mood; dysphoric and congruent affect; and circumstantial and vague thought processes. Tr. 606-07. Thought content included a suicidal plan with acts of furtherance, and she had fair insight and limited judgment. Tr. 607. The treatment record notes that, despite ongoing depression, Plaintiff was not in therapy and had "not exhausted treatment algorithm." *Id*. She consented to voluntary inpatient treatment for "safety, stabilization, and medication management." *Id*. Upon discharge on July 1. 2015, Plaintiff's condition was noted as "much improved." Tr. 683.

On October 21, 2015, Plaintiff presented to the neurology clinic at Drexel Medicine for evaluation of her headaches. Tr. 809. She reported having headaches three to four times per week with pain starting in the back of her eyes. *Id*. She also reported nausea, photophobia, and occasional vomiting. *Id*. Plaintiff was assessed with "classic migraine with aura" and prescribed Topamax

and "headache cocktail" as needed. Tr. 811. During a follow-up visit on April 13, 2016, an MRI/MRA of the brain was noted as normal, and sinus CT showed a small right ethmoid osteoma. Tr. 800. Plaintiff's headache medications were adjusted, and she was directed to follow up with ENT for rhinitis and osteoma. The record reflects that Plaintiff continued to treat at Drexel Medicine for headaches through May 2017. *See* Tr. 777-806.

On December 3, 2015, Dr. Amundson performed a consulting internal medicine examination at the request of the state agency. Tr. 729. Plaintiff reported persistent problems with headaches along with blurry vision and numbness in the fingers. *Id*. Dr. Amundson opined that Plaintiff could sit, stand, and walk four hours each total in a workday; and sit for two hours and walk for one hour each at any single time. Tr. 734. He also opined that Plaintiff had blurry vision during severe headaches. Tr. 736.

On December 15, 2015, Plaintiff saw Lisa Correale, MSW ("Ms. Correale"), at Philadelphia Consultation Center, for psychological treatment. Tr. 768. Plaintiff reported that she was estranged from her family, but she keeps in contact with her mother who has cancer. *Id*. She also reported financial difficulties and grieving the death of a former boyfriend. *Id*. On mental status examination, she had sad/depressed mood; sad/tearful affect; bizarre thoughts; and she was poorly groomed with poor hygiene, garbled speech, and loose associations. *Id*. Ms. Correale described Plaintiff as "extremely distressed" and "theatrical." She also noted that Plaintiff "requires medication to ameliorate symptoms of dysthymic disorder" and indicated that Plaintiff should "[a]ttend all scheduled med-check appointments and comply with medication recommendations." Tr. 769.

Also on December 15, 2015, Plaintiff consulted with psychiatrist Andrew Peshek, M.D. ("Dr. Peshek"). Tr. 759-67. Plaintiff reported her recent inpatient psychiatric hospitalization and

stated "she went to JFK [for outpatient treatment] after discharge from hospital but didn't like it." Tr. 759.  She also reported she was just getting over four days of migraines. Tr. 760. On mental status examination, Dr. Peshek noted appropriate appearance; anxious and irritable affect; brief, distracted concentration; depressed, persistent and anxious mood; disorganized, confused and vague thought process; and appropriate thought content. Tr. 763. He further noted adequate insight and judgment, fair remote and recent memory, and fair problem solving. *Id*.  Dr. Peshek diagnosed dysthymic disorder and prescribed Doxepin, Remeron, and Zoloft. Tr. 767.

Thereafter, Plaintiff continued to treat with Ms. Correale and Dr. Peshek. Tr. 742-57. On January 5, 2016, she had depressed and sad mood; sad and tearful affect; continued bizarre thoughts; poor grooming and hygiene; garbled speech; and loose associations. Tr. 757. On January 19, 2016, she reported improvement in mood. Tr. 752. On February 2, 2016, she had depressed, sad, agitated, frustrated mood; sad and tearful affect; continued bizarre thoughts; poor grooming and hygiene; garbled speech; and loose associations. Tr. 751. On March 24, 2016, she had similar mental status examination findings. Tr. 748. On April 7, 2016, she reported "less anxiety" and "pretty good mood." Tr. 745. On April 15, 2016, it was noted that Plaintiff had been compliant with attending psychotherapy and med-check appointments. Tr. 743.

On April 18, 2018, Plaintiff had an initial mental health assessment at Progressions Behavioral Health Services, Inc. ("Progressions"), for treatment of anxiety and depression and causes of her severe headaches, which she stated were affecting her relationship with her significant other. Tr. 855-58. She reported that she had severe migraines and a diagnosis of cluster headaches. Tr. 855. She also reported suicidal ideation but stated she "will not do it" despite sometimes having a plan to overdose on medication. Tr. 856. Although Plaintiff was "tearful and

sobbing most of the time," she progressively relaxed towards the end of the session and expressed her willingness to attend therapy. Tr. 858.

On May 22, 2018, Plaintiff attended a family therapy appointment with her boyfriend. Tr. 850. The therapist noted depressed mood, congruent affect, and tangential thought processes. *Id*. Plaintiff was sad and crying during the session, and the therapist noted that Plaintiff's boyfriend was dominating and controlling. Tr. 850-51. On May 23, 2018, Plaintiff attended her first individual therapy session. Tr. 848. The therapist observed labile affect and congruent affect. *Id*. Her thought process was goal directed, and she initiated interactions with the therapist. *Id*. Plaintiff discussed her current stressors, and the therapist discussed coping strategies. *Id*.

On August 21, 2018, Plaintiff attended an initial psychiatric evaluation at Butler Clinic. Tr. 863-75. She reported being depressed and anxious. Tr. 863. Plaintiff also reported that she had applied for social services and was required to get a psychiatric evaluation. *Id*. She had recently moved to Buffalo from Philadelphia to take care of her mother who was sick with cancer, but her mother had died; she had lost her apartment in Philadelphia and was staying with friends. *Id*. On mental status examination, Plaintiff was disheveled with poor hygiene; had fair eye contact and was timid; she was easily distracted; had anxious mood; tangential thought process; paranoid thought content "with minimal insight to such;" fair fund of knowledge; fair judgment; and limited insight. Tr. 867. Primary diagnosis was Bipolar I Disorder, most recent episode distressed, with psychotic features; she was directed to return in 1-2 weeks to discuss medications. Tr. 869.

On September 5, 2018, her appearance was noted as appropriate with fair grooming; she was attentive and made intermittent eye contact; speech was fluid and coherent but "pressured;" thought process was organized, linear, and logical with "some tangentiality;" and fair/fair to poor insight and judgment. Tr. 876. Behavior was noted as appropriate with "some mildly intrusive

behavior around writer and clerical staff." *Id*. The therapist noted that the results of Plaintiff's assessment were being sent to the disability office.  *Id*. Plaintiff returned on September 24, 2018, for development of an Individual Service Plan ("ISP"). Tr. 878.

A treatment record from Butler Clinic dated March 13, 2019 indicates that Plaintiff met twice with her primary clinician and three times with a psychiatric nurse practitioner. Tr. 942-43. Although she was prescribed Abilify, she stopped taking it "because her anxiety and depression had resolved." Tr. 942. The record notes that Plaintiff stopped keeping her appointments and was discharged from treatment. Tr. 942-43.

On June 17, 2019, Plaintiff had an initial intake assessment at BestSelf Behavioral Health, Inc. ("BestSelf"). Tr. 1014-26. She stated she "need[ed] to talk to someone" and was transferring her records from the Wellness Center, where she had been treated for PTSD, anxiety, and depression. Tr. 1014. She also reported a history of severe migraines. *Id*. She reported current severe depression with low appetite and low motivation, isolation, and severe migraines with photophobia and vomiting. *Id*. On mental status examination, her appearance was noted as "casual" and "malodorous" with "poor" personal hygiene. Tr. 1021. Her affect and mood were "depressed;" judgment was "good;" and insight was "poor." *Id*.  Her interviewer further noted "poor insight into hygiene issues." Tr. 1022.

On November 5, 2019, Nikita Dave, M.D. ("Dr. Dave"), performed a consulting internal medicine examination. Tr. 881-90. Plaintiff reported headaches since 2015 which occurred about three times per week and lasted several days at a time. Tr. 881. On physical examination, Plaintiff had slight heliotropic discoloration of the eyelids and slight heliotropic discoloration at the nasal labia folds and angles of the mouth. Tr. 883. Dr. Dave opined that opined that Plaintiff had no limitations but noted that she "may benefit from some rest intervals and breaks for any sustained

visual strain in order to apply eyedrops if needed." Tr. 883. Dr. Dave also opined that Plaintiff

could sit, stand, and walk about six hours each at a time in a workday. Tr. 886.

Also on November 5, 2019, Janine Ippolito, Psy.D. ("Dr. Ippolito"), performed a

consulting psychiatric evaluation. Tr. 894-900. On mental status examination, Plaintiff appeared

older than her state age; she was "somewhat disheveled" and "fairly groomed" with tense posture,

restless motor behavior, and fleeting eye contact. Tr. 895. She exhibited cooperative demeanor,

adequate social skills and speech; normal thought processes; anxious affect and mood; clear

sensorium; average cognitive functioning; and intact attention, concentration, and memory. Tr.

896. Dr. Ippolito opined that Plaintiff was capable of performing simple and repetitive tasks, but

she would have mild limitations in using reason and judgment, interacting with others, sustaining

concentration and performing at a consistent pace; and moderate limitations in regulating

emotions, controlling behavior, and maintaining well-being. Tr. 896-97. Dr. Ippolito concluded

that Plaintiff's psychiatric issues were not significant enough to interfere with her ability to

function on a daily basis. Tr. 897.

As noted above, Plaintiff argues that the ALJ erred in his consideration of the opinion

evidence, and therefore, his RFC findings were not supported by substantial evidence. A

claimant's RFC is the most she can still do despite her limitations and is assessed based on an

evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1),

(a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996).[3] At the hearing level, the ALJ has the

responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed.

---

[3] The Court notes that new regulations regarding the evaluation of medical evidence took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). The revisions include redefining several key terms related to evidence, revising the rules about acceptable medical sources and how the ALJ considers and articulates his consideration of medical opinions and prior administrative medical findings. See 20 C.F.R. § 416.920c (2017). However, because Plaintiff's application was filed on August 10, 2015, the previous regulations are applicable to her claim.

Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and

synthesizes all evidence available to render an RFC finding consistent with the record as a whole); *Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4 (W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v. Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot perform the RFC as found by the ALJ.).

Contrary to Plaintiff's contentions, the ALJ in this case properly analyzed and weighed the mental opinion evidence under the Commissioner's regulations. First, the ALJ considered the opinion of consultative psychologist Dr. Ippolito and reasonably found that it was entitled to great weight, as it was consistent with Plaintiff's mental treatment records, which revealed relatively benign mental status findings; it was supported by Dr. Ippolito's examination of Plaintiff: and the opinion was informed by Dr. Ippolito's knowledge of the social security program and specialization as a psychologist. Tr. 146, 148; *see* 20 C.F.R. § 416.927(c) (explaining the factors that may be considered when deciding how much weight to give to a medical source opinion, such as examining relationship, supportability, consistency, and specialization).

As the ALJ explained, Dr. Ippolito examined Plaintiff and found that she exhibited a cooperative demeanor, adequate social skills and speech, and normal thought processes, affect, mood, sensorium, orientation and cognitive functioning. Tr. 146, 895-96. Based on her

examination, Dr. Ippolito opined that Plaintiff was capable of performing simple and repetitive tasks, but she would have mild limitations in using reason and judgment, interacting with others, sustaining concentration and performing at a consistent pace; and moderate limitations in regulating emotions, controlling behavior, and maintaining well-being. Tr. 896-97. The ALJ thus incorporated Dr. Ippolito's opinion into his finding that Plaintiff could perform simple, routine and repetitive tasks, make simple work-related decisions, and only have occasional interaction with coworkers, supervisors, and the public. Tr. 144.

Plaintiff also alleges that the RFC included "generic limitations" and did not incorporate the specific limitations opined by Dr. Ippolito. *See* ECF No. 8-1 at 10.  As explained above, however, RFC is an administrative finding, not a medical determination, and the ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record, not one that tracks any particular opinion. *See Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (explaining that "an ALJ's conclusion need not 'perfectly correspond with any of the opinions of medical sources cited in his decision,' because the ALJ is 'entitled to weigh all of the evidence available to make a residual functional capacity finding that [is] consistent with the record as a whole'") (quoting *Matta*, 508 F. App'x at 56). Thus, the ALJ did not need to adopt Dr. Ippolito's opinion verbatim because he gave it great weight, as Plaintiff suggests.

Furthermore, contrary to Plaintiff's contention that the ALJ failed to explain why he did not adopt Dr. Ippolito's moderate limitations (*see* ECF No. 8-1 at 10), the ALJ explicitly noted Dr. Ippolito's opined moderate limitations and explained that he was incorporating these limitations into the RFC finding "due to [their] overall consistency with the record as a whole to support moderate level limitations." Tr. 148. To the extent Plaintiff wishes for a more detailed explanation, "[a]n ALJ does not have to state on the record every reason justifying a decision," nor is an ALJ

'required to discuss every piece of evidence submitted.'" *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (citing *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted). All that is ultimately required of the ALJ's decision is sufficient analysis to permit meaningful judicial review of the ALJ's rationale in relation to the record evidence, which the ALJ provided here. *See McIntyre*, 758 F.3d at 150; *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). Such is the case here.

Moreover, Plaintiff is wrong in her assertion that Dr. Ippolito's opined moderate limitations conflict with the ALJ's RFC finding for a range of simple work. *See* ECF No. 8-1 at 10. The Second Circuit has long held that even moderate limitations in the activities required of unskilled work do not preclude a person from performing unskilled work. *See Lawler v. Astrue*, 512 F. App'x 108, 111-12 (2d Cir. 2013) (unskilled work consists of understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers, and usual work situations, and dealing with changes in a routine work setting); *Zabala v. Astrue*, 595 F.3d 402, 407, 410-11 (2d Cir. 2010) (moderate limitation in performing the activities of unskilled work does not prevent a claimant from performing unskilled work); *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (finding that a limitation to unskilled work accounted for the claimant's moderate limitations).

In addition to Dr. Ippolito's opinion, the ALJ also considered the moderate limitations opined by state agency psychological consultant Dr. Ostrich. Tr. 147, 255. The ALJ accorded Dr. Ostrich's opinion significant weight, explaining that he is an acceptable medical source with knowledge of the Social Security program disability; he had the benefit of reviewing the longitudinal record; and his opinion was consistent with the medical evidence of record, as well as consistent with Dr. Ippolito's findings. Tr. 147.

Furthermore, opinion evidence is only one type of evidence an ALJ is required to consider. The ALJ "will assess your residual functional capacity based on all of the relevant medical and other evidence," not just medical opinions. 20 C.F.R. § 404.1545(a); 20 C.F.R. §§ 404.1513(a)(1), (4), 416.913(a)(1), (4) (explaining that evidence that can be considered includes objective medical evidence, such as medical signs and laboratory findings; as well as evidence from nonmedical sources, including the claimant, such as from forms contained in the administrative record). As the ALJ noted, Dr. Ippolito's opinion was also consistent with Plaintiff's mental health treatment records, Plaintiff's reported activity level, and her history of non-compliance with treatment, all of which supported moderate level limitations. Tr. 144-49.

Similarly unavailing is Plaintiff's contention that Dr. Ippolito's opinion that Plaintiff had mild difficulties concentrating required the ALJ to include an off-task time limitation in his RFC finding. *See* ECF No. 8-1 at 10. The ALJ's limitation of Plaintiff to simple work more than accounts for a mild limitation in concentration, and Plaintiff's assertion that she needs off-task time is not supported by the record. *See Swanson v. Comm'r of Soc. Sec.*, No. 1:18-CV-00870 EAW, 2020 WL 362928, at *5 (W.D.N.Y. Jan. 21, 2020) ("[T]here is no medical opinion or other evidence in the record to suggest that Plaintiff's limitations would cause Plaintiff to be off-task 15 percent or more of the day. As such, Plaintiff's argument is wholly speculative."). Based on the foregoing, the ALJ's mental RFC finding was supported by substantial evidence, and the Court finds no error.

In her second point, Plaintiff argues that ALJ erred by neglecting to discuss Dr. Amundson's opinion that Plaintiff could sit, stand, and walk four hours each total in a workday; and sit for two hours and walk for one hour each at any single time, and that she had blurry vision

during severe headaches. *See* ECF No. 8-1 at 12 (citing Tr. 734, 736). As noted previously, the ALJ assigned great weight to Dr. Amundson's opinion. Tr. 147.

With respect to Plaintiff's contention that the ALJ erred by failing to incorporate Dr. Amundson's opinion regarding her vision, the Court finds no error.  Although Dr. Amundson stated that Plaintiff experienced "blurry vision during severe headaches," he did not actually find that Plaintiff had any visual limitations, or any limitations related to her vision. Tr. 736. In fact, Dr. Amundson explicitly opined that Plaintiff could read very small print, book print, view a computer screen, differentiate between small objects, and avoid ordinary hazards. Tr. 736. Thus, the ALJ appropriately declined to adopt any visual limitations into his RFC finding. Tr. 144.

With respect to Dr. Amundson's opinion that Plaintiff could sit, stand, and walk four hours each total in a workday; and sit for two hours and walk for one hour each at any single time, the ALJ found that these limitations were "accommodated for by the reduced range of light exertion with additional postural limitations." Tr. 147, 148, 734. However, the ALJ neglected to discuss the detailed contents of Dr. Amundson's medical source statement and did not explain how postural limitations accommodate a limitation in sitting, standing, and walking. As previously noted, light work requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10. Although the Commissioner argues that Dr. Amundson's opinion that Plaintiff could stand and walk, each for four hours, "more than meets the [regulatory] requirement" (*see* ECF No. 9-1 at 10), the Court disagrees and finds that  the RFC does not incorporate or otherwise address Dr. Amundson's opinion that Plaintiff could sit, stand, and walk each for four hours total in a workday; and sit for two hours and walk for one hour each at any single time. Tr. 734.

Although the ALJ was not required to accept everything about which Dr. Amundson opined, he was required to explain what parts of his opinion he rejected and why. *See Jacob K. v. Comm'r of Soc. Sec.*, No. 20-CV-825-LJV, 2021 WL 4324379, at *4 (W.D.N.Y. Sept. 23, 2021) (citing *Younes v. Colvin*, No. 1:14-CV-170 DNH/ESH, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015); *Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015)). Because the ALJ did not provide any reason for omitting the sit/walk/stand limitation, the Court has no idea whether the ALJ missed it, ignored it, or disagreed with it for some legitimate reason. Accordingly, the Court finds that the ALJ's failure to address this limitation was error.

The ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that '. . . a reviewing court . . . may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (third alteration in original) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)). Because the ALJ failed to discuss Dr. Amundson's opined sit/walk/stand limitation, that bridge is missing here. *See Welch v. Chater*, 923 F. Supp. 17, 20-21 (W.D.N.Y. 1996) ("Even if this Court were to accept the ALJ's general conclusion that [the] plaintiff has the residual functional capacity to perform simple, low-stress work, this Court is still unable to determine whether she can perform her past relevant job as a cleaner without any knowledge regarding the demands of that job."). Here, the vocational expert testimony did not clarify whether the jobs identified could be done with the addition of a sit/stand/walk limitation, further establishing the harm of the ALJ's error. *See* Tr. 198-201.

On remand, the ALJ must either explain why he did not credit Dr. Amundson's opinion regarding Plaintiff's sit/stand/walk limitations, or he must incorporate those limitations into the RFC.

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 8) is **GRANTED IN PART**, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and this matter is **REMANDED** to the Commissioner for further administrative proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g). *See Curry v. Apfel*, 209 F.3d 117, 124 (2d Cir. 2000). The Clerk of Court is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE